Good morning, Your Honors. May it please the Court, my name is Timothy Scott for the appellant, Mr. Ibanez-Espinosa. I'd like to reserve two minutes for rebuttal. This conviction and 60-month sentence should be reversed for two reasons. First, the district court on this motion to substitute counsel failed to conduct the inquiry that this court requires before denying the motion. Secondly, the record that does exist in this case, despite the inadequate inquiry, strongly suggests that there was an objective breakdown in communication between Mr. Ibanez and his court-appointed lawyer. Now first, as to the failure to inquire, under the direct appeal standard that this case is presented to the court in, this court imposes a substantial duty of inquiry on the district court when presented with a motion to substitute counsel. Alito, is your concern that the judge didn't ask enough questions? Because he did actually address your client, didn't he? He did. Okay. And my concern is precisely that. What the law imposes on the district court is a duty to ask probing questions, to delve deeply into any potential conflicts. What would the judge have learned that he didn't discover from, because it's pretty clear to me from reading the record that there was simply a disagreement between your client and the former lawyer about whether or not he wanted to plead guilty. Well, as an initial matter, we're left somewhat in the dark as to what the judge might have learned. That's one of the chief problems presented. What's your proffer? What more would the court have learned, had he asked? Well, I'm unable to proffer factually, because we don't know. But what I imagine we would learn is that there was, for some reason, an objective inability of Mr. Ibanez to understand his lawyer. What we might have learned is that he wasn't being visited by the lawyer or that he wasn't being explained exactly what his options were. Let me ask you this. Do you agree that we have to take what happened in that colloquy against the background of what had happened before in the case, what else the judge knew? I take it there's no – there was no change of judge here? No. Judge Burns was the district court judge. And the same lawyer had been representing him earlier. Correct. And am I correct that there had been a competency inquiry? Yes. The communication problems were so profound that the judge – or, excuse me, that the court-appointed lawyer actually asked the judge to have her client evaluated for competency. Right. It turned out that there was nothing wrong with the client in terms of his mental capacity. There was simply a profound breakdown of communication. We know – But, okay. So there had been a competency inquiry because the judge knew that there was a problem in communication. Correct. The client wanted to plead guilty to the indictment. The lawyer said, I'm not known for pleading clients to the indictment, which I suppose is not unusual. And he was facing, what, five – the mandatory minimum? The 60-month minimum – excuse me, minimum mandatory sentence, yes. And are you claiming the client didn't understand that? Yes. Yes. I would grant that during the Rule 11 colloquy, he was advised of the statutory maximums and minimums in those areas. And there was a competency determination on top of that. Correct. And you're not challenging the adequacy of the Rule 11 inquiry? Not per se, but I do think that there's circumstantial evidence within it that shows that the client didn't have as full an understanding as would have been appropriate. So I guess I'm still back to my first question. What more did the district judge need here in order to reverse his ruling and determine that there was such a breakdown between lawyer and client that the lawyer was no longer effectively representing the client? When the client said, I just want to plead guilty, I want to make her understand it, that would have been a perfect opportunity for the district court to say, understand what, Mr. Urbanis? What is it that the district – what is it that your attorney doesn't understand? Or the district court could have said, you mean – or clarified, plead guilty. What do you mean by that? Do you want to enter into a plea agreement? Do you want to have further discussions with the AUSA? Do you feel that she's not understanding that you feel you're guilty, but you don't want to have the five-year maximum? Could have explained the consequences of just saying that instead of using all of his speculation about what he could have learned from other people at the MDC to inform a decision not to substitute counsel. I mean, my problem with this is whether we have enough here for meaningful appellate review. And that's, frankly, I think our strongest argument. It's difficult to discuss to what extent there's a breakdown because the record is so sparse. Well, what's the strongest case for your position that we would look to in this situation? Because it seems a little unusual to me. Adelzo. United States v. Adelzo Gonzales is directly on point. The Moore case that Adelzo cites is on point, as is Nguyen and Musa. In each of these cases, the district court did let each side say their piece, as the district court judge did here. And in each of those cases, the district court judge made findings. But in all of those cases, this court held that it was insufficient because there's not enough of a record for meaningful appellate review. I would concede that the district court made findings. I would suggest to the court that there's two problems with that. One, they were the wrong findings. They didn't address the relationship between attorney and client. Instead, it focused only on the attorney's perceived competency as well as the client's perceived sanity. But second, they were findings that weren't predicated on sufficient facts. Not to be glib, I could make very detailed findings about who will win the Democratic primaries tomorrow.  I'm working too hard. Perhaps I'm anticipating a close race. I'm still in trouble, though, by the fact that given the history of this case, the client's admission at the time to the agents that he was a paid smuggler, his persistent desire throughout to plead guilty, the attorney's statement to the judge that she didn't want her client to plead because she didn't want to be known for pleading her client straight up to the indictment. I'm still puzzled as to what more do we need. I mean, it seems to me there's an adequate record here to say that the district court did not abuse its discretion in determining that there was just a difference of opinion between lawyer and client, and it's the client's choice, it's not the lawyer's. Yeah, but you know what really troubles me is the court seemed to not even understand that he was supposed to make this inquiry, because we're going through this long colloquy, and Ms. Franklin, who's his attorney, is saying he's not understanding me, and he thinks because he's not understanding me that I'm not effectively communicating. So his own lawyers say we're not meeting in our communication, because communication is three parts. It's sending the message, the message in transmission, and it's receiving the message, and obviously something was getting mixed up in that communication. But then she finally says to the judge, would you just let him explain to you why he needs, and the court says, of course I will, and then the AUSA interrupts, and then the court says, no, that is privileged information, a lack of understanding between Ms. Franklin and Mr. Ibbitt, so it gives me the impression that maybe the judge is tiptoeing around. I mean, he thinks he can't ask these detailed questions. When, in fact, the law imposes a duty. Duty to ask. To probe. So I notice I'm under two minutes. May I respond to your Honor's question? Yeah, please. I still reserve a little rebuttal. I'd like to respectfully take issue with framing this as a case of a lawyer who didn't want to compromise her trial dog credentials, if you will, and a client who simply wanted to plead guilty. There was one statement that I'm not known for pleading people to the face. Which sounds to me that I don't want my reputation that I roll over too easily to get out in the community. The problem is that's easy to say. I mean, you could say that once. That's what she said. And the second problem with that is that there is no evidence in the record that that's the truth. When the motion was made to the district court, it was supposedly the day before trial. No motions in limine had been filed. No motions had been filed whatsoever in the case, save for a discovery motion, which is commonly used to toll the speedy trial act. There's no evidence in the record of any investigation of this case, and there would be, because this is a criminal justice case. And then perhaps most troubling, this very same attorney abandoned this client on appeal, for lack of a better word. And I don't mean to be pejorative, except that for a year, that attorney did nothing, despite repeated orders from this court, to advocate for the client on appeal. Okay. You've just about used your time. Very good. Thank you. Thank you. We'll give you a minute on rebuttal if there may be some further questions. Thank you. Thank you. May it please the Court. Caleb Mason for the United States. I'd like to address the areas of the record that I think most strongly demonstrate that, in fact, there was no breakdown in communications here, and that the district court did make an adequate inquiry. Before you get into that, let me ask you something. You have a lot. You're from the Southern District of California. Yes, Your Honor. You have a lot of these types of cases, right? Yes, Your Honor. How many, would you say, do you have straight up guilty pleas where there's a mandatory minimum? It does happen, Your Honor. How often? I can't give you a specific number. I would say it's a fairly low percentage. Would you say it's unusual? Would you say it's unusual? Your Honor, I would not say it's unusual in a situation like this, in which there are co-defendants and in which part of the agreement consisted in a factual allocution. In this case, this defendant did not want to make that factual allocution about his involvement in the lottery scheme. How do you know that? How do you know that? That's what his attorney said at the sentencing hearing. That's what his attorney said, but he, the district judge, never asked him. Your Honor, I think typically a judge communicates with an attorney about the posture of the case. No, no. During the hearing where the judge is under an affirmative duty to make an inquiry about the communications between the attorney and the client, which I was a district court judge in the Central District. And when I used to do that, I would take the attorney and the client, and we'd have a conference about it and really inquire about what's going on. Because from this record, he says, I want to plead guilty. The attorney, I want to make her understand it. And this doesn't say I want to plead straight up guilty. It seems to me that maybe the government was holding hard for this particular factual allocution, but that there could have been more negotiations once the two of them were on the same page. Yes, Your Honor. And, in fact, the excerpts of record from pages 29 to 34 address this concern. That is the sentencing hearing. And at that point, the district judge goes through a fairly detailed discussion with both attorneys. I read that, but that's too late. Because the time that you're supposed to make this inquiry, which I myself have done many times, is at the time when you're deciding whether or not this client should have a new counsel. That's when you're supposed to make the inquiry. Certainly, Your Honor. So I would recommend you to page 11 of the appellate record, in which the district judge asks the client, first of all, why it would help him to get a new attorney. Right. And he says, I want to plead guilty. The attorney, I want to make her understand it. That's right. And the district judge then inquires of the attorney about the communications that she had had with the client. And specifically, he says, did you go through the inquiry with your client about the nature of the offer and the alternative of going to trial or pleading straight up? And she responds, yes, all that has happened. I've handled hundreds of clients. He's not a different client. She specifically addresses that concern that was she ---- But do you think it's relevant when he says, I'm basing the decision of my denial for appointment of new counsel on my knowledge of Ms. Franklin's ability, not just legal ability, but interpersonal. I mean, he obviously likes Mrs. Franklin, but Ms. Franklin. But what does that have to do with whether there's effective communication between her and her client? Well, Your Honor, it remains unclear to me what the allegation was, what was the claim. The only claim that we hear from the client himself was that he wanted to plead guilty and he felt that his attorney was hindering that desire. But isn't that an ambiguous statement? Well, Your Honor, I suppose it could be construed as ambiguous if it were interpreted as, I want to plead guilty, but I don't want the five-year mandatory minimum. Well, here's the part that confuses me. Which hearing are we talking about? Are we talking about the hearing on May 16th? Yes, Your Honor. That's at pages 11 and following of the appellate record. Right. Well, what is the ñ what does it mean, where I was perplexed, because he's pleading to the indictment. That contains a ñ if he does that, he gets a mandatory minimum. And he keeps saying, I want to apologize to Your Honor. I will never make this mistake again. I want to go back to my family. That's all. He says repeatedly, I want to go home. I found that odd, since what he was doing was pleading to the indictment that's going to put him in jail. Your Honor, I think the clearest place in the record that addresses this is pages 28 and 29, where the attorney describes the negotiation process as follows. We made a proffer. His statement regarding the co-defendant was not sufficient to help the government. It was not acceptable. He was not able to receive any benefits for 5K. That's just another instance. Would you clarify, I can't find it. Is this from the sentencing hearing? Yes. It's page 28 of the excerpt of record at the bottom of the page. See, that bothers me that you can't rely on that to ñ I mean, what we have to ask ourselves is whether those three tests are made right. And part of it is whether an adequate inquiry. And that is during the time of the hearing. That has to be focused on the time of the hearing, not subsequent events, not the sentencing. Because he's already pled guilty by the time you get to the sentencing. That can't be part of our inquiry. I think it is, Your Honor, for the following reason. Another part of your inquiry is whether or not there, in fact, was a breakdown in communications. And to look at that question, you have to look at the entire record and all of the information we have about the interaction between the attorney and the client. And at the sentencing hearing, that's the place in the record where we have the most extensive discussion of what that interaction actually consisted of. Furthermore, I would refer Your Honors to the McClendon case, which is cited in my brief, in which this Court affirmed the denial of a motion to substitute where no inquiry at all was held. And this Court said the following. While the trial judge might have made a more thorough inquiry into the substance of the alleged conflict, McClendon's description of the problem and the judge's own observations provided a sufficient basis for reaching an informed decision. Thus, the district court's failure to conduct a formal inquiry was not fatal error. And I think that that case is quite applicable here. Because, again, while Mr. Scott is surely correct that, you know, there might have been a more searching inquiry here, there are many things the district court might have done. The test in this procedural posture is whether or not the district court abused his discretion. And in the McClendon case, this Court said no, because its own analysis of the record, plus the fact that the district court did make findings, including based on his own observations, as the district court did extensively in this case. McClendon is very different from this case, though, here. McClendon did say he gave reasons. He said his counsel stuttered and wasn't that thorough in the investigation. But he was going to allow the substitution anyway. He said that he wasn't going to allow it unless the attorney showed up. And then the new attorney didn't show up, and McClendon didn't renew the motion to substitute. So that's completely different. I mean, the judge in McClendon was, even though he said, well, he's known this lawyer for nine years and the lawyer doesn't stutter, so factually the basis that McClendon asserted was wrong. But he didn't actually deny the motion to substitute. Your Honor, I believe in McClendon the district court did deny the motion to substitute. He said he would. Well, according to the facts in the case, I'm looking at them right now. He said that he refused to allow the substitution unless McClendon produced his new attorney for the scheduled start of trial that afternoon and agreed to waive any future claim of ineffective assistance of counsel. When McClendon's new attorney did not appear that afternoon, the Court denied the motion. McClendon did not renew his motion to substitute, and his retained counsel did not appear at any point during the trial. So that's not a denial. Your Honor, I guess that I would – I mean, it does appear that it was a denial. At least as I read the language in this case, I would turn to star page 789 of that case, which this Court's holding was as follows. Under these circumstances and considering the timeliness of the motion, the trial judge did not abuse his discretion in denying McClendon's motion to substitute counsel. I mean, what this Court upheld was the denial. Now, furthermore, I would note that in McClendon, the dispute about the communications was a factual dispute, and specifically whether or not the attorney stuttered. In this case, likewise, a factual dispute about Mr. Abanez's intelligence. But I thought in McClendon there was a trial. There was not a plea in which the defendant appeared to not seem to understand what it was he was doing and his counsel was against what he was doing. Tell me – help me with the chronology. This hearing to substitute was – this inquiry with respect to substitution was a week and a half before trial? Four days before motion. When was the Rule 11 colloquy? The Rule 11 colloquy took place approximately a month after that. It was scheduled after the client decided to plead guilty. And then the sentencing was some months later. You know, seven weeks later, as per the usual. And what – in the Rule 11 colloquy, did anything with respect to this come up? No, Your Honor. The Rule 11 colloquy just includes the two instances which were discussed in my brief in which the client initially said, I don't understand. The magistrate judge then repeated the instruction, and then the client said, I do understand. Well, the appellant relies on Adelgo-Gonzalez, which is a guilty plea case, which McClendon is not. Can you just discuss that briefly? Certainly. In Adelgo-Gonzalez, there was a specific communication from the defendant himself saying in open court, I want a new attorney. In our case, when the defendant was given a chance to speak, and he was given a chance to speak on two occasions during this inquiry by the district court, he did not say, I want a new attorney. He said, I want to plead guilty. The district court then inquired further and said, is it your view of this that you just want to be done with it, you want to be sentenced? Then the defendant replied, yes, I want to be sentenced. And he never said in the, okay. He never said, I want a new attorney. Go home. Okay. Thank you. Any further questions? Thank you. Thank you. I'll give you a minute en route for both. Thank you, Your Honor. I respectfully disagree that Mr. Urbano was given the opportunity to expand on what his problem was. He was asked, what difference would it make if I appointed you a new attorney? That's a completely different question, and it's sort of an invitation to him to articulate some sort of prejudice, which isn't the test under this law, under this court's law. Appropriate questions could have been, why do you want a new lawyer? Has Ms. Franklin come to see you? What is your understanding of your options? What has she told you? All of these would have been better than, what difference would it make? Which is sort of a leading question, or sort of a question that invites a non-responsive answer to what's at issue here. In looking at the colloquy at the plea, where the history of the plea negotiations is undertaken, am I correct in reading that to say that Mr. Urbano was either unable or unwilling to testify in a way that would satisfy the government's need to fill a hole in their case against the co-defendant, and for that reason, they were unable to enter into a plea that would have allowed him eligibility for a 5K1 departure? That's the government's position on appeal. I think the record undermines our confidence in the truth of that statement. At the sentencing hearing, there was considerable disagreement between the U.S. Attorney's Office and Mr. Urbano's attorney as to what efforts were made, or what exactly was proffered, what could have been said to allow him to enter into a sentencing. I thought it was at least clear to the extent that he was not able or willing to say, she recognized me from my prior visit to her home, and therefore, she couldn't have been surprised by the fact that a bunch of illegals showed up at her residence. That was the attorney's ultimate proffer at the sentencing hearing. But again, one has to think that a more thorough inquiry would have fleshed out exactly what had happened at the time. The irony is, after the attorney failed to prosecute his appeal, Mr. Urbano now does have a new attorney. The question is, is it too little too late? So we would respect the request that we remand in reverse so that Mr. Urbano could get what should have happened the first time around. Which would be what? Another run at the plea? What is it? What he received was an attorney who was communicating with him effectively in a language that he understood, was able to clearly explain to him why a plea to a five-year minimum mandatory sentence is not more advantageous than sitting through a trial for a five-year minimum mandatory sentence. But it's not going to get him very far unless he's willing to testify in a way that helps the government. Otherwise, his admissions to Border Patrol on his arrest kill him on the five-year mandatory minimum. And he lost the motion to suppress. You're saying that perhaps he didn't understand. Okay, so he didn't want to say what the government wanted him to say. Let's assume that's the case. And that the alternative would be to sit through a trial. Rather than plea straight up, because at least if he goes through the trial, there's a chance of being acquitted. Correct. Or a legal issue like the Enblanc-Lopez case arises, which, I mean, that might not apply to his case in particular. But there's a variety of reasons why it makes more sense to preserve your appellate rights to see if something beneficial happens. I'm not at all sure that that is proper. I'm just troubled because if there's anything ineffective in the performance of counsel, that would be, that could be brought up collaterally. My problem here is, and this is a direct appeal, whether or not the argument that the district court didn't ask enough questions is really going to be the solution to this problem. It's not an IEC claim per se, but I think it is effective circumstantial evidence of the lack of communication, the fact that he made a choice like that. Okay. Thank you. Thank you. The case just argued is submitted for decision. The next case, United States v. Fontenelle Sanchez, has been dismissed.
judges: Schroeder, Wardlaw, Tallman